**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
August 14, 2012

Lyle W. Cayce
Clerk

No. 11-30415

AMANDA BEECH, individually and as tutrix, guardian of her minor child, Jax
Delton Beech,

> Plaintiff-Appellee Cross-Appellant,

v.

HERCULES DRILLING COMPANY, L.L.C.,

> Defendant-Appellant Cross-Appellee.

---

Appeals from the United States District Court
for the Eastern District of Louisiana

---

Before REAVLEY, ELROD, and HAYNES, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

This case requires us to decide whether vicarious liability principles under
the Jones Act allow a seaman's wife to recover from her husband's employer for
the bizarre events that led to his tragic and untimely death. Keith Beech died
after his co-worker, Michael Cosenza, accidentally shot him aboard a Hercules-
owned vessel. The district court determined that Cosenza was acting in the
course and scope of his employment at the time of the accident. Because we
conclude that Cosenza was not acting in the course of his employment when he
accidentally shot Beech, we REVERSE.

I.

The following facts are undisputed. Keith Beech ("Beech") was a crane operator working aboard a jack-up drilling rig that his employer, Hercules, owned. Michael Cosenza ("Cosenza") worked as a driller aboard the same vessel. When Cosenza came aboard, he accidentally brought a firearm with him, which violated Hercules' policy prohibiting weapons on the vessel. Cosenza and Beech were both aware of Hercules' policy against firearms. After discovering the firearm in some of his laundry, Cosenza did not tell anyone that he had inadvertently brought it aboard. Instead, he kept it hidden in his locker on the rig. This failure to report the firearm constituted an additional violation of Hercules' safety policy.

On December 13, 2009, Cosenza was assigned to work a night shift and was the only crewman on duty. Cosenza's duties that night were to monitor the rig's generator, to check certain equipment, and to report any suspicious activity or problems. Hercules encouraged Cosenza to stay in the break room while he performed these duties, watching television and commiserating with fellow crew members. Cosenza could simultaneously watch television and monitor the generator because if something were to go wrong with the generator, the television would turn off.

Beech was not on duty but was aboard the vessel and subject to the call of duty. Both men were in the rig's television room, watching television and chatting. Beech mentioned that he was thinking about purchasing a small firearm, and Cosenza, thinking Beech might be interested in seeing his firearm, left the break room and went to his locker to retrieve it. Upon returning, Cosenza showed the firearm to Beech, who inspected it but did not handle it. As Cosenza sat back down in the TV room, his arm bumped a part of the couch, and the firearm accidentally discharged, mortally wounding Beech.

Mrs. Beech subsequently brought a wrongful death action against Hercules under the Jones Act. After a bench trial, the district court granted

judgment in favor of Mrs. Beech, individually, in the amount of $876,997.00 and as tutrix, guardian of her minor child, Jax Delton Beech, in the amount of $317,332.00, for a total recovery of $1,194,329.00. *Beech v. Hercules Drilling Co.*, 786 F. Supp. 2d 1140, 1150-51 (E.D. La. 2011). Hercules contends on appeal that Beech and Cosenza were not acting in the course of their employment at the time of the accident and that the district court's judgment in favor of Mrs. Beech must, for that reason, be reversed. Mrs. Beech cross-appeals, arguing that the district court failed to include loss of fringe benefits damages in its damages award.

## II.

The parties dispute what standard of review should apply to the course of employment issue. Hercules contends that, because the facts relevant to the course of employment issue are all undisputed, only the legal determination of whether those facts meet the course of employment standard remains for us on appeal. Hercules argues that we should review this purely legal question *de novo*. Mrs. Beech, on the other hand, cites Fifth Circuit precedent for the proposition that "[w]hether or not an employee acted within the scope of his employment is a question for the factfinder," warranting clear error review. *See Smollen v. United States*, 1995 WL 29214, at *4 (5th Cir. Jan. 11, 1995) (per curiam) (unpublished but precedential under Fifth Circuit Rule 47.5.3) ("Where there is a fact issue as to the 'course and scope' of an employee in performing a particular task which may give rise to an issue of liability upon the part of the master, that issue should be submitted for the jury's determination.") (quoting *Ryder Truck Rentals v. Latham*, 593 S.W.2d 334, 336-37 (Tex. Ct. App. 1979)). Hercules counters that *Smollen* and *Ryder Truck Rentals* do not stand for the proposition that we always review course of employment issues for clear error. Instead, those cases both emphasize that "where there is a fact issue" as to scope of employment, clear error applies. Because there are no such fact issues in this

case, Hercules argues that de novo review is appropriate, *Smollen* and *Ryder Truck Rentals* notwithstanding.

We resolved this question in *Hussaini v. Marine Transp. Lines, Inc.*, a persuasive, though unpublished, opinion:

> Determinations of scope of employment, and, thus, vicarious liability, are most accurately characterized as mixed questions of law and fact because they involve legal conclusions based upon factual analysis. Mixed questions should be reviewed under the clearly erroneous standard if factual questions predominate, and *de novo* if the legal questions predominate.
>
> When, however, the district court has plainly identified its findings of fact, separately and distinctly from its legal conclusions, we may properly proceed with *de novo* review of the legal conclusions, even if the underlying facts are in dispute. This does not encroach upon the district court's factfinding function, but rather fulfills our obligation to review the interpretation and application of the law. In such instances, the "mixed" questions of law and fact have been "unmixed" by the district court, enabling us to review the factual components under the clearly erroneous standard, and the legal components *de novo*.

158 F.3d 584 (5th Cir. 1998) (unpublished) (citations omitted). De novo review is even more clearly appropriate here, where all of the facts are settled and undisputed, leaving us only with the familiar task of applying the law to the facts.

## III.

### 1.

We review the Jones Act briefly before proceeding to the merits. Prior to its enactment, seamen could not recover against their employers for either the employer's own negligence or the negligence of a fellow crew member. *The Osceola*, 189 U.S. 158 (1903) (overruled by the Jones Act, now codified at 46 U.S.C. § 30104). Instead, seamen were limited to compensation under the general maritime law, which included only two theories of recovery, both of which are still available today: unseaworthiness, and maintenance and cure. *Id.*

at 175-76. Unseaworthiness is a claim under general maritime law "based on the vessel owner's duty to ensure that the vessel is reasonably fit to be at sea." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441 (2001) (citing *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960)). "A claim for maintenance and cure concerns the vessel owner's obligation to provide food, lodging, and medical services to a seaman injured while serving the ship." *Id.* (citing *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 527-28 (1938)).

In 1920, Congress enacted the Jones Act to create "a negligence cause of action for ship personnel against their employers." *Withhart v. Otto Candies, L.L.C.*, 431 F.3d 840, 843 (5th Cir. 2005) (citations omitted). It provides:

> A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section.

46 U.S.C. § 30104. By incorporating "[l]aws of the United States regulating recovery for personal injury to, or death of, a railway employee," the Jones Act extends the protections of the Federal Employer's Liability Act ("FELA")[1] to seamen, and thus FELA case law applies to Jones Act cases. *Id.*; *see also Withhart*, 431 F.3d at 843 ("In passing the Jones Act, Congress did not specifically enumerate the rights of seamen, but extended to them the same rights granted to railway employees by FELA.") (citing *Cox v. Roth*, 348 U.S. 207, 208 (1955)).

The Supreme Court has consistently held that the Jones Act is "'entitled to a liberal construction to accomplish its beneficent purposes,'" which is to "provide for 'the welfare of seamen.'" *See, e.g.*, *Cox*, 348 U.S. at 210 (quoting

---

[1] FELA provides, in relevant part, that "[e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce" for "such injury or death resulting in whole or in part from the negligence" of the railroad carrier. 45 U.S.C. § 51.

*Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783, 790 (1949)). Liberal

construction is necessary because of the seaman's broad and perilous job duties:

> Unlike men employed in service on land, the seaman, when he finishes his day's work, is neither relieved of obligations to his employer nor wholly free to dispose of his leisure as he sees fit. Of necessity, during the voyage he must eat, drink, lodge and divert himself within the confines of the ship. In short, during the period of his tenure the vessel is not merely his place of employment; it is the frame-work of his existence.

*Aguilar v. Standard Oil Co.*, 318 U.S. 724, 731-32 (1943); *see also Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994) ("We have liberally construed FELA to further Congress' remedial goal."); *Harden v. Gordon*, 11 F. Cas. 480, 485, 483 (No. 6,047) (C.C.D. Me. 1823) (Story, J.) (explaining that seamen "are emphatically the wards of the admiralty" because they "are by the peculiarity of their lives liable to sudden sickness from change of climate, exposure to perils, and exhausting labor").

This liberal construction has resulted in broader employer liability under the Jones Act and FELA than would have been possible under the common law:

> In order to further [the Acts'] humanitarian purposes, Congress did away with several common-law tort defenses that had effectively barred recovery by injured workers. . . . [The Acts] abolished the fellow servant rule, rejected the doctrine of contributory negligence in favor of that of comparative negligence, and prohibited employers from exempting themselves from [the Acts] through contract; a 1939 amendment abolished the assumption of the risk defense.

*Gottshall*, 512 U.S. at 542-43. Yet the Supreme Court has been equally adamant that liberal construction "does not mean that [FELA or the Jones Act are] workers' compensation statute[s]." *Id.* at 543. Neither makes "the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur." *Id.* at 543; *see also Morant v. Long Island R.R.*, 66 F.3d 518, 522 (2d Cir. 1995) (citing *Gottshall*, 512 U.S. at 543). Accordingly, the common law's limits on employer liability are

entitled to great weight in FELA and Jones Act cases "subject to such qualifications as Congress has imported into those terms." *Id.*; *see also id.* at 544 ("Only to the extent of these explicit statutory alterations is FELA an avowed departure from the rules of the common law.") (internal quotation marks omitted); *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 338-39 (5th Cir. 1997) (citing *Gottshall*, 512 U.S. at 542-44) (holding that common law principles are entitled to great weight in Jones Act cases).

One of those common law principles that still carries "great weight" in the FELA and Jones Act context is that an employer may be vicariously liable for its employee's negligence under the doctrine of respondeat superior so long as the negligence occurred "in the course of employment." *See, e.g.*, *Landry v. Oceanic Contractors, Inc.*, 731 F.2d 299, 303 (5th Cir. 1984); *Sobieski v. Ispat Island, Inc.*, 413 F.3d 628, 632 (7th Cir. 2005) ("[V]icarious liability may extend to FELA or Jones Act employers under the traditional doctrine of respondeat superior. Well-established precedent applies the common law principle that an employer may be vicariously liable for its employee's negligence (or intentional tort) committed within the course or scope of employment—that is, committed while furthering the employer's (or the ship's) business.") (citations omitted); *but see Baker v. Baltimore & Ohio R.R. Co.*, 502 F.2d 638, 641 (holding that "[u]nder the FELA a defendant's liability for the negligence of its servants is not restricted by the common law doctrine of respondeat superior"). This case turns on the meaning of the phrase "in the course of employment" and more specifically on whether Cosenza and Beech were acting in the course of their employment when Cosenza accidentally shot Beech.

2.

Proceeding to the merits of this case, the district court explained, and neither party disputes, that in order to hold an employer vicariously liable under the Jones Act for one employee's injury caused by the negligence of a co-employee, a plaintiff must show that the injured employee and the employee who

caused the harm were both acting in the course of their employment at the time of the accident. It concluded that Beech was acting in the course and scope of his employment because he was aboard the vessel and subject to the call of duty at the time he was shot. It also concluded that Cosenza was acting in the course of his employment, reasoning as follows:

> [A]t the time Mr. Cosenza's handgun discharged and injured Mr. Beech, Mr. Cosenza abandoned his purpose of showing off the gun and was in the process of sitting down on the couch to watch television. . . . In fact, Hercules encouraged Mr. Cosenza to watch television between rounds, while on-duty. Conversation with other crew members, even when touching upon personal matters, was therefore well within the permissible boundaries of his job activity that night. Thus, the Court finds that at the critical moment—when the gun discharged—Mr. Cosenza was acting in the course and scope of his employment.

Hercules contends that because Cosenza's decision to show off his firearm did not further Hercules' business interests, and because it was in no way related to his job duties, he was not acting within the course and scope of his employment at the time of the accident. Moreover, Hercules argues that if this factual scenario does not bring a seaman outside the course and scope of his employment, then no scenario could, meaning the Jones Act would effectively place employers under strict liability.

Mrs. Beech counters that "[a]s strange as it sounds, Mr. Cosenza's duties on December 13, 2009 included sitting around the T.V. room doing nothing more than monitoring the conditions on the rig." Mrs. Beech takes the position that at the precise moment the firearm fired, Cosenza was doing just that, and therefore, he was acting in the course and scope of his employment.

IV.

1.

The parties and the district court cite potentially conflicting standards for when an employee's conduct falls within the course and scope of his employment.

In *Stoot v. D & D Catering Serv., Inc.*, we held that an employer is only liable for the wrongful acts committed by its employee when the employee's tortious conduct is in furtherance of the employer's business. 807 F.2d 1197, 1199 (5th Cir. 1987)). Joseph Stoot was employed as a seaman aboard the MR. DAVE, a jack-up drilling rig. *Id.* at 1198. His unique job duties prevented him from eating his meals during regular hours, which upset Eloise Porter, the chief cook aboard the vessel. *Id.* This disagreement eventually erupted into a violent altercation, culminating in Stoot insulting Porter, who responded by slashing several of Stoot's fingers off with a large knife. *Id.* The question was whether Porter was acting in the course of her employment at the time of Stoot's injuries. *Id.*[2] We explained that the course of employment issue "must be analyzed within the framework of established agency principles." *Id.* at 1199-1200. We quoted Section 245 of the Restatement (Second) of Agency as follows:

> A master is subject to liability for the intended tortious harm by a servant to the person or things of another by an act done in connection with the servant's employment, although the act was unauthorized, if the act was not unexpectable in view of the duties of the servant.

*Id.* at 1200. We went on to quote Comment C of Section 245 as well, which provides:

> The master, however, is relieved from liability under the rule stated in this Section if the servant has no intent to act on his master's behalf, although the events from which the tortious act follows arise while the servant is acting in the employment and the servant becomes angry because of them.

*Id.* (also citing *Offshore Logistics v. Astro-Marine, Inc.*, 482 F. Supp. 1119, 1121 (E.D. La. 1980)).

Applying this standard, we explained that "Porter was motivated to cut Stoot from anger and revenge following Stoot's personal profane statement to

---

[2] *Stoot* never mentions the Jones Act, but neither party contends that it is inapplicable here for that reason.

her rather than for reasons related to her employment." *Id.* We held that this finding "supports the district court's conclusion that Porter's action was outside the course and scope of her employment." *Id.* (citations omitted).

Mrs. Beech argues that *Stoot* does not apply here because that case involved an intentional tort, and Cosenza's actions in this case were negligent, not intentional. She cites no case, however, that has held that different standards apply to cases depending on whether the underlying injury was caused intentionally or negligently. Indeed, we have never endorsed such a rule, and the Seventh Circuit has explicitly rejected it. *See Sobieski*, 413 F.3d at 631 n.3 & 632 (holding that the same course and scope of employment standard applies under the Jones Act whether the underlying injury-causing-conduct was negligent or intentional).

The Sixth Circuit, by contrast, has held that it was unnecessary to show that the negligent employee was acting in furtherance of the employer's business interests because course and scope of employment "includes not only actual service, but also those things necessarily incident thereto." *Baker v. Baltimore & Ohio R.R. Co.*, 502 F.2d 638, 641-42 (6th Cir. 1974) (citations omitted). In *Baker*, a rail car inspector was on his lunch break when a coworker picked up a coat, causing a pistol to fall out of the coat's pocket. 502 F.2d, at 640. The pistol discharged when it hit the ground, wounding the employee. *Id.* The employee filed suit under FELA, but the employer argued that it was not liable for the co-worker's negligence because the negligence did not occur in the course of his employment. *Id.* The Sixth Circuit held that because the course of employment includes not only actual service but also "those things necessarily incident thereto," the employee was within the course of employment. *Id.* at 642. It went on to hold that "[u]nder the FELA a defendant's liability for the negligence of its servants is not restricted by the common law doctrine of respondeat superior," and that "[i]t is unnecessary to show that [employees] were negligent while performing a particular act 'in furtherance of their master's business,' as this

common law term has been interpreted." *Id.* at 641 (citations omitted). Mrs. Beech urges us to apply *Baker*'s standard.

Hercules points out that one of our sister circuits has criticized *Baker*'s reasoning. In *Sobieski v. Ispat Island, Inc.*, one crewman injured another by performing unrequested and unexpected neck tractioning on him. 413 F.3d 628, 629-30 (7th Cir. 2005). The injured seaman sued his employer under the Jones Act, claiming that the employer was vicariously liable for the amateur chiropractor's handy-work. *Id.* at 632. He argued that the court should "extend liability to the [Jones Act] employer for all negligent acts by employees which occur on the vessel." *Id.* In support of his argument, the injured seaman cited *Baker*'s very broad standard and its rejection of the application of the common law doctrine of respondeat superior to Jones Act claims. *Id.* at 632-33.

The Seventh Circuit rejected the injured seaman's argument, explaining that to prove that the negligent employee's actions to have been in the course of employment, the injured seaman "must show that the employee's tort was committed in furtherance of the employer's business." *Id.* at 632 (citations omitted). As for *Baker*, the Seventh Circuit was "unpersuaded . . . by [its] analysis." *Id.* at 633. The *Sobieski* court explained that *Baker* "read FELA's statutory language and liberal purpose too broadly," and held that "plaintiffs must . . . show that [the coworker] acted in furtherance of the ship's business." *Id.* Fleshing out that standard, the court explained that "regardless of how individual courts have stated the tests, in order for an activity to qualify as being within the scope of employment, it must be a necessary incident of the day's work or be essential to the performance of the work." *Id.* at 634 (internal quotation marks omitted). The co-worker's "tractioning of necks clearly [fell] within that category of acts commonly held to be outside the scope of employment—those undertaken by an employee for a private purpose and having no causal relationship with his employment." *Id.* at 634-35 (internal quotation marks omitted); see also *Lancaster v. Norfolk & W. Ry. Co.*, 773 F.2d

11

807, 813 (7th Cir. 1985) (Posner, J.) (criticizing *Baker* and deploying the business interest standard to determine course of employment under FELA).

It is unclear what test the district court applied. It discussed the *Stoot* test but distinguished *Stoot* because the tort there was intentional. It also discussed the *Baker* standard but distinguished *Baker* because the *Baker* employee's conduct did not violate a company safety policy. Finally, the district court briefly alluded to a third standard, namely that "an employee whose wrongful, negligent conduct results in accidental injury to a fellow employee still acts in the course and scope of his employment for purposes of vicarious liability, unless the act is motivated by some purpose inimical to the interests of the employer or co-worker." The district court cited no authority for this last standard, and we are aware of none.

Although Hercules is correct that we adopted the business interests test in *Stoot*, the district court explained that we have also applied a standard similar to *Baker*'s in our prior cases. *See, e.g.*, *Fowler v. Seaboard Coastline R.R. Co.*, 638 F.2d 17, 20 (5th Cir. 1981) (holding that "[s]cope of employment has been interpreted to encompass acts incidental to the employment as well as the actual work") (citations omitted). Today we make clear that we agree with the Seventh Circuit that regardless of whether the underlying injurious conduct was negligent or intentional, the test for whether a Jones Act employee was acting within the course and scope of his employment is whether his actions at the time of the injury were in furtherance of his employer's business interests.[3] For the

---

[3] While no other circuit has relied on *Baker*'s course of employment standard, several have applied standards similar to the one articulated by the Seventh Circuit in *Sobieski*. *See, e.g.*, *Galosse v. Long Island R.R. Co.*, 878 F.2d 80, 82-83 (2d Cir. 1989) (citing *Copeland v. St. Louis–San Francisco Ry. Co.*, 291 F.2d 119, 120 (10th Cir. 1961) and *Hoyt v. Thompson*, 174 F.2d 284, 285 (7th Cir. 1949)) (holding that "under FELA [and the Jones Act], employers are liable for the negligence of their employees only if it occurs within the scope of employment, and no liability attaches when an employee 'acts entirely of his own impulse, for his own amusement, and for no purpose of or benefit to the defendant employer'"); *Lowden v. Atchison Topeka and Santa Fe Ry.*, 937 F.2d 491, 492 (9th Cir. 1991) (agreeing with the district court that whether employee acted "within the scope of his employment" depended on the employee's

No. 11-30415

reasons discussed below, we conclude that Cosenza was not acting within the course and scope of his employment when he accidentally shot Beech. In light of that holding, we need not reach the issue of whether Beech was acting within the course and scope of his employment, because even if he was, Mrs. Beech could not recover from Hercules under the Jones Act.

2.

Applying the business interests test, the record indicates that Hercules' business interests with regard to Cosenza that night were simple. It only needed him to monitor the generator, check certain equipment, and report any suspicious activities or problems. Hercules' detailed safety policies also memorialize the common sense notion that it had a business interest in ensuring its workers' safety, particularly with regard to firearms.

Whatever test it applied, the district court ultimately found that Cosenza was acting in the course of his employment at the time of the accident. It stated in its order:

> [T]he most credible evidence supports the conclusion that at the time Mr. Cosenza's handgun discharged and injured Mr. Beech, Mr.

---

"motivation and whether [his] act furthered the railroad's business"); *Taylor v. Burlington N. R.R. Co.*, 787 F.2d 1309, 1312-13 (9th Cir. 1986) (Kennedy, J.) (citations omitted) (holding that "under the theory of respondeat superior," a Jones Act or FELA "employer is liable for the intentional assaults committed by its employee in furtherance of the employer's business"); *Feichko v. Denver & Rio Grande W. R.R. Co.*, 213 F.3d 586, 592-93 (10th Cir. 2000) (holding that an employee "was not acting within the scope of his employment" for FELA purposes because his actions at the time of his injury were not "in furtherance of the railroad's interests" and were instead "a purely private activity . . . which provided no benefit to his employer"); *Copeland v. St. Louis–San Francisco Ry. Co.*, 291 F.2d 119, 120-21 (10th Cir. 1961) (holding that an employer is only liable under FELA where the employee's acts are "in furtherance of the master's business," not where they are "entirely upon [the employee's] own impulse, for his own amusement, and for no purpose of or benefit to the defendant employer"); *Brooks v. Washington Terminal Co.*, 593 F.2d 1285, 1288 (D.C. Cir. 1979) (citing *Jamison v. Encarnacion*, 281 U.S. 635 (1930)) (holding that "an assault committed by an employee in the course of the discharge of his duties and in furtherance of the work of the employer's business can serve as the basis for liability under [FELA]"); *Slaughter v. Atl. Coast Line R.R. Co.*, 302 F.2d 912, 915 (D.C. Cir. 1962) (citing *Jamison*, 281 U.S. 635) (holding that "no recovery may be had unless the tort was committed in the course of the discharge of [the employee's] duties and in the furtherance of the employer's business").

Cosenza had abandoned his purpose of showing off the gun and was in the process of sitting down on the couch to watch television. Because of the potential dangers associated with having a single crew member on duty at night, Mr. Cosenza was cautioned by Hercules not to do too much. In fact, Hercules encouraged Mr. Cosenza to watch television between rounds, while on-duty. Conversation with other crew members, even when touching upon personal matters, was therefore well within the permissible boundaries of his job activity that night. Thus, the Court finds that at the critical moment—when the gun discharged—Mr. Cosenza was acting in the course of his employment.

There are at least two problems with the district court's reasoning. First, it assumes that because Cosenza could monitor the generator (by watching television) while holding a loaded firearm, he was acting consistently with his job duties and was therefore within the course and scope of his employment. That assumption overlooks Hercules' vital business interest in Cosenza's other job duties that night, most notably his duty to "report suspicious activities or problems." A person with a loaded weapon sitting in the vessel's break room would undoubtedly have constituted precisely the sort of suspicious activity or problem that Hercules was relying on Cosenza to report. Instead of reporting it, he created it, and disaster struck. Thus, the district court's reasoning that Cosenza's job duties that night were so broad and relaxed that even handling a loaded firearm in the break room was consistent with them fails.

Second, the district court's emphasis on the distinction between "showing off the firearm" and "sitting down on the couch" implies that it would have concluded that Cosenza was outside the course of employment had the firearm discharged while he was still "showing it off." That distinction is irrelevant, though, because neither showing off a loaded weapon nor sitting down on the couch while holding one furthered Hercules' business interests. Indeed both were inimical to it.

Mrs. Beech argues that Cosenza's extraordinary breeches of Hercules' safety policies are irrelevant to the course of employment analysis, but that

cannot be right. It may be true that not every violation of safety policy automatically casts an employee outside the course of his employment. *See, e.g.*, *Frederick v. Swift Transp. Co.*, 616 F.3d 1074, 1079-80 (10th Cir. 2010) (holding that a truck driver who violated safety policy by ingesting methamphetamine was nevertheless acting within the course and scope of her employment under New Mexico law when she drove the company's truck on her assigned route under the employer's directions, attempting to meet the employer's deadlines, but emphasizing that "we certainly do not hold that ingesting illicit drugs can never remove an employee from the course and scope of employment"). But that does not mean that no violation of safety policy can ever take an employee out of the course and scope of employment. The safety policy violation in this case is not dispositive of the course and scope of employment issue, but it is relevant because it gives guidance regarding what employee conduct furthers Hercules' business interests. For the reasons discussed above, Cosenza's leaving the break room to retrieve a loaded firearm when he was supposed to be monitoring the generator and watching out for suspicious behavior took him outside the course and scope of his employment.  Indeed, Cosenza's conduct was so clearly contrary to Hercules' business interests, that our conclusion would be the same even if there had not been a policy in place specifically forbidding this sort of behavior.

Furthermore, if Cosenza's conduct aboard the HERCULES 101 did not take him outside the course of his employment, it is unclear what could have. Courts have long held that as broad as Jones Act liability is, it is not strict liability. *See Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994) (admonishing that the liberal construction requirement "does not mean that [FELA or the Jones Act are] workers' compensation statute[s]"); *see also id.* (emphasizing that neither the Jones Act nor FELA makes "the employer the insurer of the safety of his employees while they are on duty").

Our conclusion would be the same even if we applied the Sixth Circuit's incidental to job duties test. The fact that Cosenza's job duties were broad and

relaxed does not mean that anything and everything he might choose to do while watching television is incidental to those job duties. Merriam-Webster defines "incidental" as "being likely to ensue as a chance or minor consequence." The record contains the testimony of multiple witnesses to the effect that an incident like the one at issue in this case is unheard of, and even Mrs. Beech does not argue that Hercules should have anticipated this sort of behavior. Mrs. Beech makes no attempt to explain what having a loaded firearm in the break room against company safety policies had to do with monitoring the generator that night. As explained above, not only was Cosenza's conduct not incidental to monitoring the generator, it was directly inconsistent with his duty to report suspicious behavior. Far from incidental to his job duties, Cosenza's behavior was inconsistent with them. Therefore, we hold that at the time of the accident, Cosenza was not acting in the course of his employment.

This is a difficult case with the most sympathetic and tragic of facts. Cosenza's broad and flexible job duties exemplify the unique characteristics of the seaman's work that animate the liberal construction we apply to the Jones Act. *See, e.g.*, *Aguilar*, 318 U.S. at 731-32 ("Unlike men employed in service on land, the seaman, when he finishes his day's work, is neither relieved of obligations to his employer nor wholly free to dispose of his leisure as he sees fit. Of necessity, during the voyage he must eat, drink, lodge and divert himself within the confines of the ship. In short, during the period of his tenure the vessel is not merely his place of employment; it is the frame-work of his existence."). It is equally clear, however, that the liberality of our construction must stop short of imposing strict liability upon Jones Act employers. *Gottshall*, 512 U.S. at 542-43. Deciding where an employee's conduct falls on the course and scope of employment continuum is  necessarily a fact-intensive inquiry, and courts have few bright line principles to guide them. Some conduct that is consistent with a very broad and flexible job duty will nevertheless be so contrary to the employer's business interests, so unforeseeable by the employer,

16

and so far removed from the employee's role as employee as to be outside the course and scope of employment. Even construing the course and scope of Cosenza's job duties very liberally, his handling of a loaded firearm in the vessel's break room fell outside the course and scope of his employment.

V.

Because we conclude that Cosenza was outside the course and scope of his employment, we do not reach whether Beech was in the course of his employment at the time of the accident. Likewise, because there can be no Jones Act liability where Cosenza was not acting in the course of his employment, we need not reach Mrs. Beech's cross-appeal regarding the district court's damages calculation. For these reasons, REVERSE the district court's judgment in favor Mrs. Beech, and render judgment in favor of Hercules.